UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**SECURITIES AND EXCHANGE COMMISSION ,**

**Plaintiff,**

**-vs-** **Case No. 6:05-cv-1880-Orl-31KRS**

**ROANOKE TECHNOLOGY CORP., DAVID L. SMITH, JR., THOMAS L. BOJADZIJEV & BARRETT R. CLARK,**
**Defendants.**

---

**SUSSEX AVENUE PARTNERS, LLC,**
**Relief Defendant.**

---

# ORDER

This matter comes before the Court on the motion of Defendant Barrett R. Clark ("Clark") to dismiss counts II, III, and VII (Doc. 75) of the Second Amended Complaint (Doc. 63) filed by the Plaintiff, the Securities and Exchange Commission ("SEC"). In resolving the instant motion, the Court has also considered the SEC's response (Doc. 79).

**I. Background**

The following allegations, taken from the Second Amended Complaint, are accepted as true for purposes of resolving this motion to dismiss. *Miree v. DeKalb County, Ga.*, 433 U.S. 25, 27 n.2 (1977).

Defendant David L. Smith ("Smith"), the president and CEO of Defendant Roanoke Technology Corporation ("Roanoke"), engaged in a so-called "pump and dump" scheme involving

Roanoke's stock. (Doc. 63 at 1). Smith would issue misleading press releases to increase the price of Roanoke's stock, then sell it (or have it sold) to reap the profits. (Doc. 63 at 1).

Smith used consultants, including Clark, to further his scheme. (Doc. 63 at 1). Clark would receive Roanoke stock from Smith – purportedly as payment for consulting services – sell the shares, and return a portion to Clark in the guise of a loan. (Doc. 63 at 1-2). In at least some instances, Clark transferred the proceeds to his own company, Relief Defendant Sussex Avenue Partners, LLC ("Sussex Avenue"), which then forwarded a portion to Smith. (Doc. 63 at 3). Clark had Sussex Avenue enter into six sham promissory notes with Smith to disguise the nature of the transfers. (Doc. 63 at 13).

Smith issued the stock to Clark pursuant to Form S-8 registration statements. (Doc. 63 at 1). Stock issued pursuant to Form S-8 registration statements (henceforth, "Form S-8 stock") may be issued to consultants, but only as a means of paying for certain types of consulting services, rather than as a way for the issuer to raise capital. (Doc. 63 at 2). However, Clark provided little or nothing in the way of bona fide consulting services to Roanoke. (Doc. 63 at 2). In fact, despite entering into written agreements to provide various financial and strategic planning services, the only real services Clark provided were shareholder communication services and the "service" of reselling the Roanoke shares and funneling a portion of the proceeds back to Smith. (Doc. 63 at 11-12).[1] These services were worth little or nothing to Roanoke, far less than the nearly $1.5 million in stock that Clark and Sussex Avenue received in exchange. (Doc. 63 at 12). From the

[1] Form S-8 stock may not be used to pay consultants to perform shareholder communication services or reselling of shares. (Doc. 63 at 12).

start, the purported consulting arrangement was nothing more than an effort to conceal the kickback scheme between Clark and Smith. (Doc. 63 at 15).

To avoid federal stock-ownership reporting requirements, Smith and Clark had some of the Roanoke stock issued to Clark's girlfriend and to a Sussex Avenue employee, Randall Hicks ("Hicks"), purportedly as payment for consulting services. (Doc. 63 at 12-14). This stock was also issued via a Form S-8. (Doc. 63 at 13). Clark's girlfriend did not provide any consulting services, instead simply selling the stock and giving the proceeds to Sussex Avenue and Clark. (Doc. 63 at 12-13). Hicks provided only shareholder communication services. (Doc. 63 at 14). In some instances the ploy failed, and Clark's holdings became large enough to trigger an obligation to register with the SEC. (Doc. 63 at 14) Clark never did so. (Doc. 63 at 14).

## II. Standards

### A. Motion to Dismiss

In ruling on a motion to dismiss, the Court will take the complaint's allegations as admitted by the Defendant and will liberally construe them in the Plaintiff's favor. *Jenkins v. McKeithen*, 395 U.S. 411, 421 (1969). The Court will not dismiss a complaint for failure to state a claim unless it appears beyond a doubt that the Plaintiff cannot prove any set of facts that support a claim for relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). In ruling on a motion to dismiss, "conclusory allegations, unwarranted factual deductions or legal conclusions masquerading as facts will not prevent dismissal." *Davila v. Delta Air Lines, Inc.*, 326 F.3d 1183, 1185 (11th Cir. 2003); *see also U.S. ex rel. Carroll v. JFK Med. Ctr.,* 2002 WL 31941007, at *2 (S.D. Fla. Nov. 15, 2002) ("Court need not accept facts that are internally inconsistent, facts that run counter to

facts which the Court may take judicial notice of, conclusory allegations, unwarranted deductions or mere legal conclusions"); *Harding v. Winn-Dixie Stores, Inc.*, 907 F. Supp. 386, 389 (M.D. Fla. 1995) ("the court will not accept conclusory allegations or legal conclusions masquerading as factual conclusions").

**B. Section 10(b) and Rule 10b-5**

Section 10(b) of the Securities Exchange Act of 1934 (henceforth, "Section 10(b)") makes it unlawful for any person to use or employ, in connection with the purchase or sale of any security, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the SEC may prescribe. *SEC v. Zandford*, 535 U.S. 813, 819 (2002). "Rule 10b-5, which implements this provision, forbids the use, 'in connection with the purchase or sale of any security,' of 'any device, scheme, or artifice to defraud' or any other 'act, practice or course of business' that operates ... as a fraud or deceit.'" *Id.* (quoting 17 CFR § 240.10b-5). Rule 10b-5 also proscribes, among other things, the making of any "untrue statement of a material fact" or the omission of any material fact "necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading." 17 CFR § 240.10b-5 (2004). The scope of Rule 10b-5 is coextensive with the coverage of Section 10(b), *Zandford* at 816 n.1, and therefore the Court will generally use "Section 10(b)" to refer to both the statutory provision and the Rule.

To state a claim for securities fraud under Section 10(b), a plaintiff must allege that the defendant made material misstatements or omissions as to which he had a duty to speak, or used a fraudulent device, with scienter, in connection with the purchase or sale of securities. *See*, *e.g.*,

*SEC v. Monarch Funding Corp.,* 193 F.3d 295, 308 (2nd Cir. 1999); *Ross v. Bank South, N.A.*, 885 F.2d 723, 728 (11th Cir. 1989).

**C. Section 17(a)**

Section 17(a) of the Securities Act of 1933 (henceforth, "Section 17(a)") provides that

> It shall be unlawful for any person in the offer or sale of any securities ... by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly
>
> (1) to employ any device, scheme, or artifice to defraud, or
>
> (2) to obtain money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or
>
> (3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

A claim under Section 17(a) of the Securities Act requires essentially the same elements as a claim under Section 10(b) of the Exchange Act and Rule 10b-5, except that there is no scienter requirement for claims under Section 17(a)(2) or (3). *Monarch Funding* at 308.

**D. Rule 9(b) of the Federal Rules of Civil Procedure**

Rule 9(b) requires that "in all averments of fraud or mistake the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). However, intent may be averred generally. *Id.* The particularity requirement applies to securities fraud claims brought by the SEC, just as it does to such claims brought by private plaintiffs. *See*, *e.g.*, *SEC v. Druffner*, 353 F.Supp.2d 141, 148 (D.Mass. 2005).

## III. Analysis

Three of the counts of the Second Amended Complaint are at issue in this motion. In Count II, the SEC alleges that Clark and the other defendants violated Section 17(a)(1) by "willfully or recklessly" employing "devices, schemes, or artifices to defraud" in the "offer or sale of securities." (Doc. 63 at 19). In Count III, the SEC alleges that Clark and the other defendants violated Section 10(b) and Rule 10b-5 by "willfully or recklessly" employing "devises [sic], schemes or artifices to defraud;" by making "untrue statements of material facts and omitt[ing] material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and/or" by engaging in "acts, practices and courses of business which have operated as a fraud upon the purchasers of such securities" – all in connection with the purchase or sale of securities. (Doc. 63 at 19-20). In Count VII, the SEC contends that Clark and the other defendants violated sections 17(a)(2) and 17(a)(3) by obtaining money or property "by means of untrue statements of material facts and omissions to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading" and engaging in "transactions, practices and courses or business which are now operating and will operate as a fraud or deceit upon purchasers and prospective purchasers of such securities." (Doc. 63 at 24). As with Count II, all of the misdeeds recounted in Count VII are alleged to have occurred "in the offer or sale of securities." (Doc. 63 at 24).[2]

---

[2]In Count I, the SEC alleges that the Defendants engaged in the sale of unregistered securities. (Doc. 63 at 18-19). Count IV sets forth the SEC's allegations that Clark, Smith and one other defendant failed to register their ownership of Roanoke stock despite exceeding the amount that triggered a requirement to do so. (Doc. 63 at 20-21). In Count V and Count VI, Smith and Roanoke

Section 10(b) and Section 17(a) have essentially similar requirements that the deceptive conduct occur in connection with the "purchase or sale" or "offer or sale," respectively, of any security.[3] To constitute a violation of either section, the deceptive conduct does not necessarily have be *directly* related to such a purchase, offer, or sale. The Supreme Court has held that the "in connection with" requirement is satisfied when one suffers "an injury as a result of deceptive practices touching its sale of securities as an investor." *Superintendent of Ins. of State of N.Y. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 12-13 (1971). In *Bankers Life*, the injured party was a corporation whose stock was purchased with its own assets. *Id.* at 7. The assets at issue were U.S. Treasury bonds, which the new owners caused the corporation to sell to the public. *Id.* at 8. The new owners then used the proceeds of the bond sale to cover a kited check they had used to acquire the stock. *Id.*

Even though the bond sale, considered in isolation, appeared non-fraudulent – a fair price having been asked and paid for the bonds – the Supreme Court concluded that it violated Section 10(b). *Id.* at 12. The Court stated that Section 10(b) was not limited to preserving the integrity of the securities markets. *Id.* at 12. In the view of the Court, the corporation was "injured as an investor through a deceptive device which deprived it of any compensation for the sale of its valuable block of securities." *Id.* at 10. "Since there was a

are accused of violating various reporting requirements of the Exchange Act and the Sarbanes-Oxley Act in connection with Roanoke's quarterly reports. (Doc. 63 at 21-24).

[3]The Securities Act of 1933 regulates initial distribution of securities, and the Securities Exchange Act of 1934 for the most part regulates post-distribution trading. *Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164, 171 (1994).

'sale' of a security and since fraud was used 'in connection with' it, there is redress under [Section] 10(b)." *Id.* at 12.

Thus, securities fraud may occur "in connection with" the sale of a security even when an honest price is paid. *See also SEC v. Zandford*, 535 U.S. 813 (2002) (9-0 decision) (securities broker violated Section 10(b) by selling clients' securities so as to misappropriate the proceeds). But not every deceptive device or scheme that has any relation to a sale of securities can suffice for purposes of Section 10(b) or Section 17(a). In *Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930 (2d Cir. 1984), a group of banks sought to hold accounting firm Arthur Andersen & Co. ("Andersen") liable for securities fraud. Andersen had audited and certified the financial statements of a parent company to whom the banks had lent money. *Id.* at 933. Shortly thereafter, the parent company filed for bankruptcy protection. *Id.* The banks alleged that Andersen knew that the certified financial statements, which the banks had relied upon in making the loans, were false and misleading. *Id.* But the only securities involved in the transaction were shares of the parent company's wholly owned subsidiary, which the parent company had pledged[4] to the banks as collateral for the loans. *Id*. at 941. Andersen had not certified or audited any financial statements for or regarding the subsidiary. *Id.* at 933 n.6.

Stating that the purpose of Section 10(b) "is to protect persons who are deceived in securities transactions – to make sure that buyers of securities get what they think they are getting and that sellers of securities are not tricked into parting with something for a price

---

[4]The *Andersen* court held that such a pledge was an "offer or sale" for purposes of Section 10(b). *Id.* at 939.

known to the buyer to be inadequate or for a consideration known to the buyer not to be what it appears to be," the appellate court dismissed the claim. *Id.* at 943. The fact that the allegedly false financial statements and the subsidiary's stock were all part of the same transaction was not enough to bring it within the ambit of Section 10(b): "Andersen is not alleged to have deceived the Banks with respect to the pledge of the [subsidiary's] stock; the Banks got exactly what they expected. ... [Section 10(b) imposes] liability for a proscribed act in connection with the purchase or sale of a security; it is not sufficient to allege that a defendant has committed a proscribed act in a transaction of which the pledge of a security is a part."

The instant case, at least with regard to Clark, seems more analagous to the situation in *Andersen* than the one in *Bankers Life*. If one accepts the allegations of the Second Amended Complaint as true, it is clear that Smith committed securities fraud when he caused Roanoke to issue dishonest press releases to inflate the value of Roanoke's stock. It is also clear that Clark engaged in bad acts (for lack of a better term) by accepting payment, in stock, for consulting services he did not perform or for the wrong type of consulting services, by using straw men to avoid ownership-reporting requirements, by failing to report his ownership when the ploy failed, and by helping Smith funnel money out of Roanoke via a kickback scheme. But even though securities fraud was committed, and even though stock was offered, purchased, and sold, it is not clear that Clark's "bad acts" were done in connection with the offer, purchase, or sale.

The SEC does not allege that Clark was even aware of the false public statements Smith made to inflate Roanoke's stock, much less that Clark made such statements himself.

(Doc. 79 at 8). Instead, the SEC contends that Clark made various misrepresentations and omissions – about the nature of the services he was to provide (and whether he intended to provide them), about the "scheme to thwart S-8 filing registration requirements," and about the kickback scheme. (Doc. 79 at 8). And the SEC points out that it has alleged that Roanoke issued millions of shares to Clark, and that Clark sold those shares and turned some of the proceeds over to Smith. (Doc. 79 at 16). That, the SEC argues, is sufficient to demonstrate that the fraud was 'in connection with" the offer, purchase, or sale of a security. (Doc. 79 at 15-16). The vagueness of the asserted connection shows that the SEC is, at best, arguing that Clark "committed a proscribed act in a transaction of which the pledge of a security is a part".

An attempt to hold Clark liable for Smith's falsehoods without knowledge of their existence would run afoul of *Central Bank of Denver*, in which the Supreme Court held that Section 10(b) does not extend to aiding and abetting liability.[5] Of course, Smith's falsehoods are not the only dishonest acts asserted in the Second Amended Complaint. But aside from Smith's efforts to pump up the price of Roanoke's stock, the Court cannot tell what, if anything, constituted securities fraud in this case. The SEC has not attempted to make such a showing, instead simply listing Clark's bad acts on the one hand and his

[5]At a hearing in connection with a similar motion in regard to the First Amended Complaint (Doc. 30), the Court inquired of the SEC why no aiding and abetting charge had been filed against Clark. As recounted above, none of the counts of the Second Amended Complaint assert such a charge As Clark puts it, presumably the SEC has considered the Court's inquiry and determined that no aiding and abetting charge can be sustained, given the higher level of knowledge required to prevail in such actions after *Central Bank of Denver* and passage of the PSLRA. (Doc. 75 at 10-11). If this is the case, it is difficult to see how Clark's conduct could nonetheless rise to the level of fraud.

securities transactions on the other. This is insufficient. "Section 10(b) is aptly described as a catchall provision, but what it catches must be fraud." *Chiarella v. U.S.*, 445 U.S. 222, 234-235 (1980).

Because of this lack of a connection, the fraud counts of the Second Amended Complaint fail to state a claim as to Defendant Clark. In addition, the details of the alleged fraud(s) are too vague to satisfy Rule 9(b). The Second Amended Complaint adequately specifies a number of dishonest acts and a number of securities transactions, but it fails to specify the particulars of the actual scheme, such as whom Clark intended to defraud and which of his alleged misrepresentations were directed to that end. Rather, everything is lumped together and Clark (and this Court) are left to figure out the outlines of the plot. But depending upon the details of the alleged scheme, such things as the materiality of a particular statement or Clark's obligation to correct a misrepresentation might vary.[6] Clark should not have to defend himself against such an amorphous mass of allegations.

Should the SEC choose to replead those counts, it must specify, as to Clark, the fraudulent statements or omissions he made, when and to whom the statements were made (or, as to omissions, not made), whom the statements or omissions were intended to influence, and what transactions they were made in connection with. It will not suffice to

---

[6]"Before liability, civil or criminal, may be imposed for a Rule 10b-5 violation, it is necessary to identify the duty that the defendant has breached." *Chiarella*, 445 U.S. at 237 (Stevens, J., concurring). One who fails to disclose material information prior to the consummation of a transaction commits fraud only when he is under a duty to do so. *Id.* at 228. And this duty only arises when one party has information that the other party is entitled to know because of a fiduciary or other similar relation of trust and confidence between them. *Id.*

argue that every misstatement and omission Clark allegedly made was in connection with every Roanoke stock transaction during this time frame. *See, e.g., Ziemba v. Cascade Intern., Inc.*, 256 F.3d 1194 (11th Cir. 2001) (in private Section 10(b) case, stating that "Rule 9(b) is satisfied if the complaint sets forth (1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.") (internal quotation omitted).

**IV. Conclusion**

In consideration of the foregoing, it is hereby **ORDERED AND ADJUDGED** that the motion to dismiss (Doc.75) is **GRANTED** and counts II, III, and VII of the Second Amended Complaint are **DISMISSED WITHOUT PREJUDICE** as to Defendant Clark.. If it opts to do so, the SEC may file a third amended complaint not more than 20 days after the issuance of this order.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on December 26, 2006.

**GREGORY A. PRESNELL**
**UNITED STATES DISTRICT JUDGE**

Copies furnished to:

Counsel of Record
Unrepresented Party